EXHIBIT 3

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DOCKET NO. 1984CV01774

)
)
JONATHAN MULLANE,                )
)
*Plaintiff,*                     )                 **TRIAL BY JURY DEMANDED**
)
v.                               )
)
PORTFOLIO MEDIA, INC.,           )
)
*Defendant.*                     )
)
)

## VERIFIED FIRST AMENDED COMPLAINT
## AND REQUEST FOR A MANDATORY INJUNCTION

COMES NOW Plaintiff Jonathan Mullane (hereinafter, "Plaintiff"), and complaining of Defendant Portfolio Media, Inc. (hereinafter, "Defendant" or "Portfolio Media"), brings this action for declaratory and injunctive relief, together with monetary damages. As and for his complaint, Plaintiff avers as follows:

## PARTIES

1.  Plaintiff Jonathan Mullane is a natural person and citizen of the Commonwealth of Massachusetts, and resides in Somerville, Middlesex County.

2.  Defendant Portfolio Media, Inc. is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business at 111 W 19th Street, 5th Floor, New York, New York 10011.

## JURISDICTION AND VENUE

3.  This Court has exclusive original jurisdiction pursuant to Mass. Gen. Laws ch. 212 § 3, because Plaintiff claims monetary damages in excess of $25,000, together with equitable relief.

4.  This Court has specific personal jurisdiction pursuant to Mass. Gen. Laws ch. 223A § 3, and because the exercise of jurisdiction by this Court comports with constitutional due process.

5.  *Inter alia*, the unlawful acts and omissions of Defendant foreseeably and directly caused the republication of the subject defamatory and libelous representations within this Commonwealth. See, e.g., Murphy v. Bos. Herald, Inc., 449 Mass. 42, 65 (2007).

6.  Specific personal jurisdiction in Massachusetts comports with due process pursuant to the United States Supreme Court's holding in Calder v. Jones, 465 U.S. 783, 789 (1984), because, *inter alia*, Defendant knew and intended that "the brunt of [the] injury would be felt by [Plaintiff]" in this Commonwealth.

7.  At all times relevant hereto, Defendant purposefully and specifically directed its subject libelous and bad faith conduct towards the Commonwealth of Massachusetts, the forum state and residence of Plaintiff.

## MATERIAL FACTS

8.  Plaintiff is a Massachusetts citizen and consumer who, during the initial events in question, was a full-time university law student and was not gainfully employed.

9.  At all times relevant hereto, Plaintiff was never a "public figure" nor a "limited public figure," and had certainly not undertaken any course of conduct that would foreseeably lead to his becoming a public figure.

10. At all times relevant hereto, Plaintiff did not knowingly, intentionally, or willfully inject himself into any public controversy or dispute.

11. At all times relevant hereto, Defendant had actual knowledge of the fact that Plaintiff was a Massachusetts citizen.

12. Defendant Portfolio Media is a for-profit corporation which owns and operates a publication known as "Law360[,]" which is a publicly accessible website and visible on the internet. See https://www.law360.com/.

13. During the events in question, Plaintiff was involved in a common $1,600 consumer credit dispute with Barclays Bank Delaware, a credit card corporation.

14. On or about April 16, 2018, via its Law360 publication, Defendant published an article entitled "**JUDGE RECUSES SELF, SCOLDS LAW STUDENT-PLAINTIFF[.]**" See **EXHIBIT A**.

15. The said article pertained to Plaintiff, a law student at the time in question.

16. As evidenced by the pejorative title of the subject article, together with the various false representations and assumptions contained therein, the article was published with a "malicious intention" and "actual malice" to harm and injure the reputation and good character of Plaintiff.

17. *Inter alia*, by stating that Plaintiff was "**scolded**[,]" any reasonable reader of Defendant's misleading title to the subject article would understand this to mean that Plaintiff had done something wrong or improper, or had intentionally engaged in unethical or unlawful conduct.

18. At no time relevant hereto did Plaintiff ever engage in any improper or unlawful conduct.

19. In addition to the fact that the subject April 2018 article was published with a "malicious intention," the said article contained factually-false representations and gratuitous harmful, negative, and malicious opinions, collectively adding to the "willful and knowing" defamation caused thereby.

20. By way of example only, the article falsely stated, in pertinent part:

> Mullane wanted to file a petition for a writ of mandamus with the Eleventh Circuit because Judge Moreno had not yet ruled on his motion for default judgment for Barclays' failure to respond to his complaint. **EXHIBIT A**, p. 2 ¶ 2.

21. The foregoing representation was, and remains, a factually-false statement.

22.     At no time relevant hereto did Plaintiff move for a "default judgment" with Judge Moreno. The simple reason therefor is that *any* plaintiff in an Article III court must first obtain an "entry of default" with the Clerk of Court pursuant to Fed. R. Civ. P. 55(a) *prior* to moving for a "default judgment" with the court itself.

23.     In its totality the subject April 2018 article was intentionally and knowingly unfair, unobjective, and substantially inaccurate.

24.     In its totality the subject April 2018 article was a factually-inaccurate account of events, published for the sole purpose of creating a sense of sensationalism for the financial gain of Defendant, but at the expense of injuring and harming the reputation, competency, and good character of Plaintiff, a student.

25.     By way of example only, Defendant falsely represented, in relevant part:

> The judge **pointed out** that the bank had filed a motion to dismiss, **which tolled** any other deadlines and was still pending. (Emphasis supplied) **EXHIBIT A**, p. 2 ¶ 2.

26.     A reasonable reader would mistakenly understand the foregoing unambiguous representation to mean that Plaintiff is incompetent, lacking in the basic skills and knowledge necessary to enter his chosen profession, and that he did not understand the Federal Rules of Civil Procedure vis-à-vis the deadline to file an answer—when he in fact did correctly understand this procedural issue, and his conduct was in compliance therewith.

27.     Evidencing Defendant's "ill will" and "actual malice" against Plaintiff, and in support of Defendant's factually-false contention that Plaintiff had ignorantly and/or negligently misunderstood basic rules of civil procedure, Defendant thereupon proceeded to inform its readers that Plaintiff was "a second-year law student who is representing himself in the matter [ . . . . ]" **EXHIBIT A**, p. 1, ¶ 2.

28.     Defendant knew that, by citing the irrelevant fact that Plaintiff was "a second-year law student"—a fact which cannot possibly have any nexus with a $1,600 civil credit card dispute—a reasonable reader would mistakenly understand Defendant's article to mean

that Plaintiff was utterly ignorant of the Federal Rules of Civil Procedure, and the logical inference was that he was both incompetent and inexperienced.

29. By erroneously stating that Judge Moreno "**pointed out[,]**" **EXHIBIT A**, p. 2 ¶ 2, a reasonable reader would understand this to mean that Judge Moreno was indisputably correct, and that Plaintiff's position on the procedural matter was objectively wrong—which was, in reality, factually false.

30. As further evidence of Defendant's ill-will against Plaintiff, after stating that Judge Moreno had "pointed out" what Defendant avers was an error on Plaintiff's part, Defendant Portfolio Media failed to even *mention* any of Plaintiff's supporting arguments to the contrary on the issue—all of which were of record, and were easily accessible in publicly-available filings at Defendant's disposal through a mere internet search.

31. Defendant had access to all of Plaintiff's filings in that matter, all of which were publicly visible on PACER at the time the subject defamatory article was published.

32. However, instead of engaging in fair and factually-accurate reporting, Defendant knowingly chose to omit *all* of Plaintiff's legal arguments from its defamatory article, choosing instead to *only* present all of Judge Moreno's representations as absolute, undisputed facts in pursuit of Defendant's self-serving financial interest to distort the facts for sensationalism.

33. By knowingly omitting such highly material facts from the subject article, Defendant knew, or had reason to know, that such omissions would significantly and materially alter the reasonable understanding of the said article, and thereby harm Plaintiff's reputation as a direct result thereof.

34. By knowingly omitting such highly material facts from the subject article, Defendant knew, or had reason to know, that such "willful" and "knowing" omissions would affect what any "reasonable reader" would understand to have transpired during the events in question.

35. In reality, Plaintiff—who had been offered internships at *both* the United States Attorney's Office ("USAO") and at the United States Securities and Exchange Commission ("SEC") based upon his qualifications and experience—made no such mistake or misunderstanding as the subject article represented and implied, and had in fact correctly

and timely applied for an "entry of default" with the Clerk of Court due to the untimely filing of the Rule 12 motion.

36.     Defendant knowingly and maliciously mislead its readers by omitting the highly material fact that, while Barclays Bank Delaware did indeed file a "motion to dismiss[,]" it had done so **after the deadline**, and *after* the date on which it could have been filed in order to toll the deadline to file an answer to the amended complaint. Accordingly, in such circumstances, Plaintiff had in fact properly and appropriately made an application for an "entry of default" as required with the **clerk of court**—*not* with Judge Moreno.

37.     By intentionally omitting the foregoing material fact, Defendant knew, or was willful in not knowing, that a "reasonable reader" would misunderstand what had in fact transpired, and would erroneously believe Defendant's factually-false representations that Plaintiff was at fault.

38.     By intentionally omitting the foregoing material fact, Defendant knew, or was willful in not knowing, that Plaintiff's professional and business reputation and future employment opportunities would foreseeably be harmed—which they in fact were, and continue to be, as a direct result of the subject defamatory article.

39.     Defendant further misrepresented, in relevant part:

> **SUMMARY**
>
> U.S. District Judge Federico Moreno recused himself Monday from a law student's suit against Barclays Bank Delaware over a credit card dispute, but not before he took a parting shot at the student and threatened to report him to the Florida Bar and the University of Miami School of Law for "lack of truthfulness" before the court. See **EXHIBIT A**, p. 1.

40.     A reasonable reader reading the foregoing "summary" would interpret it to mean that Plaintiff had engaged in some sort of wrongful or unethical conduct. As proof hereof, the so-called "summary" conveniently omits the fact that the subject allegations were, at all times relevant hereto, **in dispute**.

41.   A reasonable reader reading the foregoing "summary" would understand it to mean that some form of official action had been taken against Plaintiff, when in fact, no such action had been taken.

42.   No opposing arguments whatsoever were cited, or even tangentially alluded to, by Defendant in its one-sided and factually erroneous account of the subject "events."

43.   By way of further example, Defendant falsely represented, in relevant part:

> But the clerk understood that he [i.e., Plaintiff] was there representing the government [ . . . . ] **EXHIBIT A**, p. 1 ¶ 3.

44.   The representation set forth in the foregoing paragraph is factually false.

45.   Plaintiff, who—unlike Defendant—was actually present at the events in question, clearly and unambiguously informed the clerk that he was *not* representing the Government. In point of fact, Plaintiff directed the said clerk's attention to the caption of the case, which clearly showed that the United States was *not* a party to the action. Accordingly, the said clerk did *not* "[understand that Plaintiff] was there representing the government[.]"

46.   Considering the fact that the civil action in question was styled **Mullane v. Barclays Bank Delaware Inc.**, and that no other parties were named, the clerk—a person with a law school education and JD degree—obviously knew and understood that the United States was *not* a party to the $1,600 civil credit card dispute.

47.   Defendant had no factual basis whatsoever for erroneously and maliciously publishing the factually-false representation that the clerk "understood that [Plaintiff] was there representing the government[.]" *Inter alia*, Defendant: (1) did not interview the clerk; (2) did not even ask the clerk what she may or may not have "understood" during the events in question; (3) did not ask Plaintiff what had transpired during the conversation; and (4) did not rely on any testimony or other statements from the clerk.

48.   By intentionally or recklessly making false statements regarding conversations wherein Defendant was not physically present, nor was a party to, Defendant knew, or was reckless in not knowing, that its representations:

    (a) Contained factually-false and inaccurate statements;

    (b) Misled its readers as to the actual facts of Plaintiff's $1,600 credit card dispute, willfully and knowingly omitting material facts such as the arguments raised by Plaintiff in his various filings—none of which were even mentioned once in the subject defamatory article;

    (c) Contradicted publicly-available filings, together with the docket sheet; and

    (d) Falsely claimed that Plaintiff was seeking a "writ of mandamus" against Judge Moreno.

49.   Defendant made zero effort to confirm the truth of the "facts" set forth in the subject defamatory article.

50.   *Inter alia*, the subject April 2018 article falsely accused Plaintiff of criminal conduct and a "lack of truthfulness."

51.   Defendant willfully and knowingly falsely reported, and continues to report on its publicly-accessible website—as irrefutable "facts"—allegations of criminal conduct by Plaintiff, notwithstanding the fact that: (1) no criminal charges were ever brought against Plaintiff; (2) no investigation whatsoever occurred; (3) no complaint was ever filed with the Florida Bar, or the bar of any state at all; and (4) the University of Miami summarily dismissed all of the unsupported and irrational accusations made by Defendant.

52.   Notwithstanding the foregoing, Defendant knowingly and falsely accused Plaintiff of misconduct and criminal activities—stated as absolute, irrefutable facts—in connection with a mere $1,600 civil credit card dispute, *not* a criminal action or prosecution.

53.   At all times relevant hereto, Defendant knew, or was reckless in not knowing, that the representations contained in its article were patently false, and that Judge Moreno had engaged in similar irrational misconduct and *ultra vires* acts just two (2) years earlier, and had been duly reprimanded by such improper behavior in an unflattering Ninth Circuit Court of Appeals decision.

54.   Quite egregiously, in addition to publishing numerous material, factually-false representations vis-à-vis Plaintiff, Defendant conveniently and self-servingly omitted from its article the fact that Judge Moreno had been reprimanded in the aforesaid publicly-

available Ninth Circuit decision just two (2) years earlier, and that it was Judge Moreno's habit to engage in similar bizarre behavior.

55.    At the time of the original publication of Defendant's defamatory article, Defendant had **actual or constructive notice** of Judge Moreno's habit of engaging in similar improper behavior.

56.    The numerous publicly-available documents pertaining to Judge Moreno's bizarre, emotionally-unstable, and erratic behavior include, without limitation:

    (i)      Rodriguez v. Copenhaver, 823 F.3d 1238 (9th Cir. 2016) [**EXHIBIT B**];

    (ii)     "CIRCUIT SLAMS ADVICE FROM JUDGE WITH CONFLICT[,]" Courthouse News Service (June 1, 2016) [**EXHIBIT C**]; and

    (iii)    "NINTH CIRCUIT DIRECTS BOP TO RECONSIDER DENIAL OF DESIGNATION TO STATE PRISON FOR SERVICE OF FEDERAL SENTENCE[,]" Prison Legal News (August 2, 2016) [**EXHIBIT D**].

57.    In Rodriguez v. Copenhaver, 823 F.3d 1238 (9th Cir. 2016) [**EXHIBIT B**], the Ninth Circuit, discussing similar misconduct committed by Defendant Federico A. Moreno ("Moreno") in that matter, unambiguously held as follows:

> Thus, there is no doubt that the Bureau of Prisons doubly erred in considering Chief Judge Moreno's letter: First, he was not the judge who imposed the sentence as 18 U.S.C. § 3621(b)(4) contemplates; and second, he had been recused from the case and should not have participated in it in any way. The Due Process Clause of the Fourteenth Amendment requires recusal of a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [a defendant] in his case." "[T]o perform its high function in the best way, justice must satisfy the appearance of justice." In this case, Chief Judge Moreno, a colleague of an alleged victim of Rodriguez's crimes, strongly recommended "severe[] sanction[s]" and the denial of the *nunc pro tunc* designation to avoid "insult" to his colleague. To make matters worse, **the chief judge presented his recommendation under the guise of a neutral adjudicator by sending his letter in place of the sentencing judge's recommendation.** The Bureau of Prisons adopted the recused judge's recommendation and denied Rodriguez's application. **Such actions do not satisfy the appearance of justice. Nor do they afford Rodriguez his due process right to neutral adjudication.** Thus, as a matter of both statute and due process, the Bureau of Prisons should not have considered Chief Judge Moreno's letter. Furthermore, there is no way

that this error can be deemed harmless in as much as the Bureau specifically cited and relied on the Moreno letter in denying Rodriguez's application. (Emphasis supplied) at 1242-43.

58. Defendant had actual, or at least constructive, knowledge of both: (1) Copenhaver, *supra*; and (2) Judge Moreno's history of engaging in such misconduct.

59. Instead of publicizing what was manifestly *yet another* example of egregious, unprofessional misconduct committed by Judge Moreno, Defendant callously opted instead to knowingly defame Plaintiff—a mere student at the time in question, *not* a public figure or person— and acted with complete and utter disregard for the truth.

60. In this context, any "reasonable person"—let alone a self-proclaimed legal news publication—would hesitate and engage in reasonable and professionally-responsible investigatory efforts before accusing Plaintiff, a student, of *any* improper behavior, particularly in light of Judge Moreno's similar bizarre and unlawful conduct as described in the publicly-available decision of Rodriguez v. Copenhaver, 823 F.3d 1238 (9th Cir. 2016) and the *numerous* news articles publicizing that matter.

61. Defendant knew full well that its publication would foreseeably be injurious to Plaintiff's reputation and future career, and had actual knowledge of the fact that Plaintiff was a law student at the time in question.

62. Accordingly, there can be no dispute in these circumstances that Defendant acted with "actual malice" vis-à-vis Plaintiff within the meaning of Mass. Gen. Laws ch. 231 § 92. All of the foregoing information and facts were publicly-accessible sources and information chronicling Judge Moreno's prior judicial misconduct.

63. Because all of Judge Moreno's misconduct was a matter of public record and had been published and publicized on the internet *prior* to Defendant's publication of its subject defamatory April 2018 article, Defendant had actual or constructive knowledge of the fact that its representations vis-à-vis Plaintiff were factually false and constituted defamation of a "private person."

64. A reasonable person reading the subject April 2018 article would misunderstand the factually-false and malicious representations therein to be verified, corroborated, truthful, and irrefutable facts.

65. A reasonable person reading the subject April 2018 article would interpret it to mean that Plaintiff had engaged in criminal conduct and/or criminal activity.

66. A reasonable person reading the subject April 2018 article would understand it to mean that Plaintiff had violated **18 U.S.C. § 912**, a *criminal* offense punishable by **three (3) years in federal prison**.

67. A reasonable person reading the subject April 2018 article would interpret it to mean that Plaintiff was frivolously requesting an "entry of default" by the clerk of court, and not for a "good faith" reason.

68. As proof hereof, and as proof of Defendant's "malicious intent" and "ill will" against Plaintiff—a "private person"—an intentional omission was made in the subject article whereby Defendant knowingly omitted all of the *bona fide* arguments raised in Plaintiff's publicly-available filings.

69. Further, and quite unconscionably, Defendant went as far as intentionally omitting the simple fact that legal arguments had been proffered—in contradiction to the otherwise defamatory intent of the subject article.

70. As a direct result of the foregoing intentional omission, a "reasonable reader" would interpret Defendant's factually-false representations as uncontested and undisputed.

71. Under Massachusetts law, media publishers such as Defendant are **not** protected by the common law "fair reporting" privilege for publishing allegations of criminal conduct by a "private person" made **prior** to the commencement of official action. Butcher v. University of Massachusetts, 94 Mass. App. Ct. 33 (2018).

72. At all times relevant hereto, Defendant had actual or constructive knowledge of the fact that no "official action" had occurred.

73. In point of fact, even one (1) year since the events in question, no "official action" been taken against Plaintiff in relation to the factually-false assertions set forth in Defendant's article.

74. At all times relevant hereto, Defendant had actual or constructive knowledge of the fact that Plaintiff was: (1) a "private person;" (2) a citizen of the Commonwealth of Massachusetts; and (3) in Florida only *temporarily* for his law studies, and had no intention of remaining in that state.

75.  Defendant had actual knowledge of the fact that republication of its factually-false representations contained in the subject article was probable, and that republication in the Commonwealth of Massachusetts—*i.e.*, the state of Plaintiff's citizenship—was a foreseeable and direct result of Defendant's ongoing publication on its website, and that the: (1) initial original publication of the subject defamatory article; (2) the *ongoing* publication and display of the said article by Defendant on its publicly-visible website; and (3) all *republications* of the factually-false representations contained therein within this Commonwealth would all collectively cause irreparable harm to Plaintiff's personal and professional reputation.

76.  In point of fact, manifestly unsatisfied that it had inflicted enough harm on Plaintiff, Defendant subsequently *republished* the factually-false representations through reporters in its employ in Boston, Massachusetts. **EXHIBIT E.**

77.  At all times relevant hereto, Defendant acted with "ill will" and "actual malice" by publishing, and thereupon publicly displaying, its defamatory April 2018 article regarding Plaintiff—a mere student and "private person"—on the internet.

78.  By way of example only, after more reputable legal news publishers such as the National Association of Attorneys General ("NAAG")—entities which had also reported on Plaintiff's civil $1,600 credit card dispute—became aware of the fact that there was indeed a "good faith" justification to disbelieve the false representations made by Defendant, NAAG voluntarily withdrew *all* reporting thereof, such action being consistent with responsible and professional journalism.

79.  Unfortunately, even **over one (1) year** after the events in question, Defendant—who has since been fully apprised as to the falsity of its representations—still refuses to withdraw the defamatory April 2018 article from the internet. **EXHIBIT F.**

80.  To Plaintiff's surprise, when Plaintiff apprised Defendant of the factually-false representations contained in the subject article and asked that Defendant simply remove the article from its internet site—at no financial cost whatsoever to Defendant—in addition to denying Plaintiff this reasonable request by stating that Defendant is "not prepared to change it[,]" Defendant thereupon threatened Plaintiff with "anti-SLAPP" sanctions for "frivolous litigation[.]" **EXHIBIT F.**

81.     Plaintiff incurred, and continues to incur, severe economic and emotional harm as a result of Defendant's April 2018 article.

82.     Plaintiff incurred, and continues to incur, harm to his personal and professional reputation, together with harm to his good character reputation, as a direct and intended result of the publication of the subject article.

83.     Plaintiff now continues to incur severe economic and emotional harm as a foreseeable and natural consequence of Defendant's *ongoing* unjustifiable and "bad faith" refusal to remove the defamatory April 2018 article from the internet and from its website.

84.     By referring to Plaintiff as a "law student" in the subject article, Defendant had actual knowledge that its defamatory representations would foreseeably harm Plaintiff's professional reputation and employment opportunities as a future attorney.

85.     *Inter alia*, as a direct result of the subject April 2018 defamatory article, Plaintiff's employment at the SEC was abruptly terminated.

86.     By referring to Plaintiff as a "law student" in the subject article, Defendant had actual knowledge that Plaintiff was *not* a "public person" or "public figure."

87.     By referring to Plaintiff as a "law student" in the subject article—a fact which had no nexus whatsoever with the   aforesaid $1,600 civil credit card dispute—while *simultaneously* intentionally omitting **all** of Plaintiff's publicly-available legal arguments contained in the various filings, Defendant intentionally sought to discredit Plaintiff and subject him to ridicule.

88.     To Plaintiff's further detriment, numerous false representations contained in the subject article were subsequently republished within Massachusetts itself—months after the events in question.

89.     The republication of these defamatory and factually-false calumnious representations **within Massachusetts itself** was a directly foreseeable certainty and result to Defendant at the time its false and defamatory representations were made.

90.     In addition to this false and defamatory "reporting" by Defendant, and further evidencing Defendant's "ill-will" and "actual malice," Defendant knowingly and intentionally publicly disclosed private facts such as Plaintiff's confidential employment records vis-à-

vis Plaintiff which were non-public, confidential, and protected under the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*

91.   The unlawful "publication" of the subject article by Defendant is unfortunately still ongoing. Each day, twenty-four (24) hours a day and seven (7) days a week, even over one (1) year *after* the original publication, Defendant continuously displays the subject defamatory article on its website—in spite of Plaintiff's timely and reasonable requests that Defendant cease and desist from doing so.

## COUNT I

### Libel *per se* – Original Publication

92.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

93.   At all times relevant hereto, Plaintiff was, and remains, a "private person."

94.   At all times relevant hereto, Plaintiff acted individually, and not on behalf of the United States or its agencies.

95.   Plaintiff has not actively sought any publicity, public note, or prominence outside of implementing his own business affairs in private transactions.

96.   Plaintiff is not a "public figure" or official within the meaning of New York Times v. Sullivan, 376 U.S. 254 (1964) and its progeny.

97.   Defendant intentionally published to the general public the subject April 2018 article in writing.

98.   The subject article directly pertained to Plaintiff, as expressly stated in its libelous title.

99.   The subject article was defamatory.

100.  The subject article contained numerous false representations of "fact."

101.  Defendant acted with "actual malice" within the meaning of New York Times, *supra*, because it knew, or was reckless in not knowing, that its material representations in the subject article pertaining to Plaintiff were false.

102.  *Inter alia*, a cursory review of the available public records immediately reveals the falsity of Defendant's misrepresentations.

103.    Defendant acted with "actual malice" within the meaning of Mass. Gen. Laws ch. 231 §
        92, which is defined as "ill will" or "malevolent intent."[1]

104.    In the subject April 2018 article, the derogatory language cannot possibly be construed or
        interpreted as anything but malevolent.

105.    Defendant knew, or was reckless in not knowing, of the harm its defamatory
        representations would foreseeably cause Plaintiff in Massachusetts. This includes, without
        limitation, the severe harm to Plaintiff's reputation, business opportunities, employment
        opportunities, social relationships, career, and health.

106.    As a matter of law, the written representations of Defendant constitute libel *per se*. *Inter
        alia*, Defendant accused Plaintiff of having violated 18 U.S.C. § 912, a criminal offense
        punishable by three (3) years in federal prison.

107.    Defendant's libelous representations constitute libel *per se*, as Defendant knew, or had
        reason to know, that its representations would harm Plaintiff's trade or profession as a
        future attorney.

108.    The unlawful acts and omissions of Defendant were the proximate cause of the foreseeable
        harm incurred by Plaintiff.

109.    In addition to monetary and compensatory damages, Plaintiff respectfully requests that this
        Court issue a mandatory injunction ordering Defendant to remove the subject defamatory
        article, together with any and all other defamatory representations regarding Plaintiff, from
        the internet and from its website.

## COUNT II

### Libel *per se* – Republications

110.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them
        by reference as if fully restated herein.

111.    In the Commonwealth of Massachusetts, an original publisher of defamatory material is
        liable for subsequent republication within this Commonwealth where "the repetition was

---

[1] *See, e.g.*, Noonan v. Staples, Inc., 556 F.3d 20 (1st Cir. 2009).

authorized or intended by the original defamer, or **the repetition was reasonably to be expected**." (Emphasis supplied) Restatement (Second) of Torts § 576.

112.   The Supreme Judicial Court has consistently held that original publishers such as Defendant are liable for *all* subsequent republications. See, e.g., Murphy v. Bos. Herald, Inc., 449 Mass. 42, 65 (2007).

113.   By authoring and publishing the subject April 2018 article, Defendant is an "original publisher" of *per se* defamation against Plaintiff.

114.   Upon information and belief, on or about October 29, 2018, the defamatory statements were republished within this Commonwealth to Plaintiff and A Medium Corporation (hereinafter, "Medium"), a third party.

115.   On December 5, December 7, and once again on December 10, 2018, three (3) separate "republications" were made through court filings[2] by third parties Medium and Zurich American Insurance Company (hereinafter, "Zurich") containing the defamatory representations made by Defendant.

116.   All three of the December 5, December 7, and December 10, 2018 "republications" were physically made within this Commonwealth.[3]

117.   In or around December 2018, in Boston, Massachusetts, a reporter in the employ of Defendant republished the defamatory representations. **EXHIBIT E.**

118.   Defendant knew, or was reckless in not knowing, that its defamatory representations would likely be republished within this Commonwealth.

119.   Defendant knew, or was reckless in not knowing, that the republication of the subject defamatory representations would cause Plaintiff further irreparable harm.

120.   As a matter of law, the written representations of Defendant constitute libel *per se*. *Inter alia*, Defendant accused Plaintiff of having violated 18 U.S.C. § 912, a criminal offense punishable by three (3) years in federal prison.

---

[2] See, e.g., Mullane v. Zurich American Insurance Company et al., Docket No. 1:18-CV-12412 (D. Mass.).

[3] *Arguendo*, while the "republishers" of the defamatory representations may have been protected under the Massachusetts "litigation privilege," in no way does the said privilege extend to third-parties such as Defendant who, as a non-party to that action, lacks standing to invoke it.

121.   Defendant's libelous representations constitute libel *per se*, as Defendant knew, or had reason to know, that its representations would harm Plaintiff's trade or profession as a future attorney.

122.   Defendant is jointly and severally liable for all of the subsequent republications.

## COUNT III

### As and For a First Violation of Mass. Gen. Laws ch. 93A § 9

123.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

124.   Defendant Portfolio Media, Inc. is in the "trade" or "business" of operating an online publication within the meaning of Mass. Gen. Laws ch. 93A § 2 *et seq.*

125.   Plaintiff is a "consumer" within the meaning of same, and a reader of Defendant Portfolio Media, Inc.'s "Law360" publication.

126.   Defendant was served, via certified mail, return receipt requested, a written demand for a "reasonable offer of settlement" pursuant to the said ch. 93A more than thirty (30) days prior to the filing of this action.

127.   Collectively, all of Defendant's acts and omissions vis-à-vis knowingly defaming Plaintiff, a Massachusetts consumer, constitute unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A § 9, and the Attorney General's regulations published to enforce this law.

128.   Defendant unfairly refused to make a reasonable offer of settlement to compensate Plaintiff for the harm incurred.

129.   At all times relevant hereto, Defendant's unlawful acts and omissions were both "willful" and "knowing."

130.   Without limitation, Plaintiff has foreseeably suffered significant economic and emotional harm as a result of Defendant's unlawful conduct.

131.   Pursuant to Mass. Gen. Laws ch. 93A § 9, Plaintiff is entitled to recover treble damages, together with reasonable attorneys' fees and costs.

## COUNT IV

### As and For a Second Violation of Mass. Gen. Laws ch. 93A § 9

132. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

133. Defendant Portfolio Media, Inc. is in the "trade" or "business" of operating an online publication within the meaning of Mass. Gen. Laws ch. 93A § 2 *et seq.*

134. Plaintiff is a "consumer" within the meaning of same, and a reader of Defendant Portfolio Media, Inc.'s "Law360" publication.

135. Defendant was served, via certified mail, return receipt requested, a written demand for a "reasonable offer of settlement" pursuant to the said ch. 93A more than thirty (30) days prior to the filing of this action.

136. Collectively, all of Defendant's acts and omissions by refusing to remove the defamatory and factually-false article from the internet—even after it was given actual notice of the inaccuracy and falsity of the said article—constitute unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A § 9, and the Attorney General's regulations published to enforce this law.

137. Defendant unfairly refused to make a reasonable offer of settlement to compensate Plaintiff for the harm incurred.

138. At all times relevant hereto, Defendant's unlawful acts and omissions were both "willful" and "knowing."

139. Without limitation, Plaintiff has foreseeably suffered significant economic and emotional harm as a result of Defendant's unlawful conduct.

140. Pursuant to Mass. Gen. Laws ch. 93A § 9, Plaintiff is entitled to recover treble damages, together with reasonable attorneys' fees and costs.

## COUNT V
### Public Disclosure of Private Facts

141. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

142. Pursuant to Mass. Gen. Laws ch. 214 § 1B ("Right of Privacy"), "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."

143. In this Commonwealth, every person has reasonable claim, within limits, to control the flow of personal information about him. Commonwealth v. Blood, 400 Mass. 61, 69 (1987).

144. *Inter alia,* art. XIV of the Massachusetts Declaration of Rights guarantees all citizens of this Commonwealth such as Plaintiff a reasonable expectation of privacy.

145. Pursuant to Mass. Gen. Laws ch. 4 § 7(c), the disclosure of personnel files or information, or any other materials or data relating to a specifically-named individual such as Plaintiff, may give rise to an invasion of privacy claim.

146. Defendant knew, or was willful in not knowing, that publishing excepts from Plaintiff's confidential employment records, which were unlawfully seized without a warrant, would cause Plaintiff serious and irreparable harm.

147. The publication of unsubstantiated allegations of criminal conduct gives rise to a cognizable claim for invasion of privacy. See, e.g., Haggerty v. Globe Newspaper Co., 383 Mass. 406 (1981).

148. The information from Plaintiff's employment records, which was publicly disclosed, "published," and "republished" by Defendant, was in no way a matter of "public concern" as it entailed a private matter.

149. Defendant's invasion of Plaintiff's right to privacy was unreasonable, substantial, and serious.

150. At all times relevant hereto, Plaintiff had a reasonable expectation that his USAO employment records would be kept private.

151. Defendant intruded upon Plaintiff's solitude and seclusion, together with Plaintiff's right to be left alone.

152.   The invasion of privacy, especially the publication of excerpts from Plaintiff's confidential employment records, is highly offensive to any reasonable person.

153.   As a direct consequence of Defendant's invasion of privacy, Plaintiff foreseeably incurred substantial harm, including, without limitation, the foreseeable mental anguish and suffering therefrom.

154.   Defendant was the proximate cause of Plaintiff's harm.

155.   Defendant acted with "actual malice" by maliciously and wantonly invading Plaintiff's right to privacy.


## COUNT VI

### Tortious Interference with Prospective Economic Relations

156.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

157.   At all times relevant hereto, Defendant had actual knowledge of the fact that Plaintiff was: (1) a law student; and (2) was employed at the USAO.

158.   Defendant knew, or was willful in not knowing, that its actions would cause Plaintiff to lose, in whole or in part, the highly probable economic benefits and advantages of future employment and business relationships.

159.   By way of example only, after the publication of the subject April 2018 article, the SEC withdrew its offer of employment to Plaintiff.

160.   Defendant acted with "actual malice," as Defendant's purposes were spiteful and malignant.

161.   As further described hereinabove, Defendant "willfully" and "knowingly," either directly or indirectly, interfered with Plaintiff's business relationships through an improper motive and improper means.

162.   Defendant acted with the sole purpose of harming Plaintiff, and acted by means that are dishonest, unfair, or otherwise improper.

163.   Defendant's interference was the proximate cause of Plaintiff's harm.

164. Plaintiff foreseeably lost the innumerable advantages of future business and employment relationships as a direct and natural result of Defendant's conduct.

165. Defendant lacked any privilege to induce the said losses.

## COUNT VII
### Intentional Infliction of Emotional Distress

166. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

167. As further explained hereinabove, Defendant acted intentionally vis-à-vis Plaintiff.

168. Defendant knew, or was willful in not knowing, that emotional distress was the likely and foreseeable result of its conduct.

169. Defendant's conduct, as described hereinabove, was extreme, outrageous, beyond the standards of civilized decency, and utterly intolerable in a civilized society.

170. Defendant is the direct and proximate cause of Plaintiff's distress.

171. Plaintiff foreseeably suffered—and continues to suffer—emotional distress as a result of Defendant's conduct.

172. The emotional distress sustained by the Plaintiff was severe and of a nature that no reasonable person could be expected to endure it.

## COUNT VIII
### Violations of Mass. Gen. Laws ch. 214 § 1B
### and Art. XIV of the Massachusetts Declaration of Rights

173. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

174. Pursuant to Mass. Gen. Laws ch. 214 § 1B ("Right of Privacy"), "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."

175. In this Commonwealth, every person has reasonable claim, within limits, to control the flow of personal information about him. Commonwealth v. Blood, 400 Mass. 61, 69 (1987).

176. *Inter alia,* Art. XIV of the Massachusetts Declaration of Rights guarantees all citizens of this Commonwealth such as Plaintiff a reasonable expectation of privacy.

177. At all times relevant hereto, Defendant's acts and omissions were willful, knowing, and deliberate.

178. Pursuant to Mass. Gen. Laws ch. 4 § 7(c), the disclosure of personnel files or information, or any other materials or data relating to a specifically-named individual such as Plaintiff, gives rise to an invasion of privacy claim.

179. The publication of unsubstantiated allegations of criminal conduct gives rise to a cognizable claim for invasion of privacy. See, e.g., Haggerty v. Globe Newspaper Co., 383 Mass. 406 (1981).

180. The information from Plaintiff's employment records, which was publicly disclosed, "published," and "republished" by Defendant, was in no way a matter of "public concern" as it entailed a private matter.

181. Defendant's invasion of Plaintiff's right to privacy was unreasonable, substantial, and serious.

182. At all times relevant hereto, Plaintiff had a reasonable expectation that his USAO employment records would be kept private.

183. Defendant intruded upon Plaintiff's solitude and seclusion, together with Plaintiff's right to be left alone.

184. Defendant acted without authorization, and intentionally invaded the private affairs of Plaintiff.

185. The invasion of privacy is highly offensive to any reasonable person.

186. As a direct consequence of Defendant's invasion of privacy, Plaintiff foreseeably incurred substantial harm, including, without limitation, the foreseeable mental anguish and suffering therefrom.

187. Defendant was, and remains, the proximate cause of Plaintiff's harm.

188. Defendant acted with "actual malice" by maliciously and wantonly invading Plaintiff's right to privacy.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all claims, issues, and questions of fact so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** on the premises aforesaid, Plaintiff prays for relief and respectfully requests that this Honorable Court:

(i)     Enter judgment in favor of Plaintiff and against Defendant on all counts of the complaint;

(ii)    Issue a mandatory injunction and order permanently barring and enjoining Defendant from engaging in such unlawful conduct;

(iii)   Issue a mandatory injunction ordering Defendant to remove the subject defamatory article, together with any and all other defamatory representations regarding Plaintiff, from the internet and from its website;

(iv)    Grant declaratory relief against Defendant for all of the unlawful acts and omissions as described herein;

(v)     Award Plaintiff all damages sustained as a result of Defendant's unlawful conduct pursuant to all counts herein, including, but not limited to, economic damages vis-à-vis the lost business and employment relationships; lost future earnings and economic losses; monetary compensation for Plaintiff's loss of reputation, mental anguish, emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence, and loss of personal dignity; and damages for Plaintiff's emotional pain and suffering, together with all other physical or mental injuries;

(vi)    Award consequential damages in an amount to be determined at trial;

(vii)   Award expectancy damages in an amount to be determined at trial;

(viii)  Award treble damages as permitted under Mass. Gen. Laws ch. 93A § 9, in an amount to be determined at trial;

(ix)    Award Plaintiff attorneys' fees, costs, and pre- and post-judgment interest; and

(x)     Grant such further relief as this Court may deem just and proper.

Respectfully submitted,

JONATHAN MULLANE,
Plaintiff (*pro se*)
60 Clyde Street, Unit #1
Somerville, MA 02145
Tel.: (617) 800-6925
j.mullane@icloud.com

DATED: June 28, 2019

## VERIFICATION

I, JONATHAN MULLANE, under oath, hereby state that I have reviewed the within Verified First Amended Complaint, and, based upon my own personal knowledge, hereby verify and affirm that the allegations contained therein are true and accurate, and hereby certify that no material facts have been omitted therefrom.

Signed under the pains and penalties of perjury this 28th Day of June, 2019.

JONATHAN MULLANE

# EXHIBIT A

## _Judge Recuses Self, Scolds Law Student-Plaintiff_

April 16, 2018



A LexisNexis® Company

Copyright © 2019 Portfolio Media, Inc. All rights reserved.

**Author:** Carolina Bolado

## Summary

U.S. District Judge Federico Moreno recused himself Monday from a law student's suit against Barclays Bank Delaware over a credit card dispute, but not before he took a parting shot at the student and threatened to report him to the Florida Bar and the University of Miami School of Law for "lack of truthfulness" before the court.

## Body

U.S. District Judge Federico Moreno recused himself Monday from a law student's suit against Barclays Bank Delaware over a credit card dispute, but not before he took a parting shot at the student and threatened to report him to the Florida Bar and the University of Miami School of Law for "lack of truthfulness" before the court.

The judge granted the recusal motion by Jonathan Mullane, a second-year law student who is representing himself in the matter, but said he would be pulling surveillance tape of the court for Friday, March 23, when Mullane allegedly visited the judge's clerk to inquire about getting a copy of the case record so he could request a writ of mandamus from the Eleventh Circuit.

Mullane says he wore a T-shirt, yellow shorts and flip-flops, and made clear to the clerk that he was there for the personal matter, namely his lawsuit against Barclays, and not in his capacity as an intern at the U.S. Attorney's Office for the Southern District of Florida. But the clerk understood that he was there representing the government, and Judge Moreno said that on the day in question, he worked at the U.S. attorney's office from 11 a.m. until 5 p.m., according to the office's attendance log.

Mullane said that at a hearing last week, Judge Moreno made "farfetched, irrational and patently false" accusations about what the judge called an improper meeting with his clerk and threatened to hold him in contempt of court and to report him to his bosses at the U.S. attorney's office.

"The undersigned judge continues to be concerned with the law student's lack of awareness of what ex-parte communications are and the importance of candor by litigants, particularly future lawyers," Judge Moreno said. "Because of these concerns, the court will grant the plaintiff's motion to recuse. However, the court reserves the right upon further investigation to refer the matter to the Florida bar, the University of Miami School of Law, and the United States Attorney for any action they deem appropriate."

Mullane is suing Barclays over an alleged billing error that the bank refused to correct. He says that Barclays never responded to his demand letter, so he notified the bank in writing that he would invoke his right under the Fair

2 of 2

Judge Recuses Self, Scolds Law Student-Plaintiff

Credit Billing Act to withhold payment until the error was corrected or resolved. He claims that Barclays then retaliated by reporting his account as delinquent to various credit agencies.

Mullane wanted to file a petition for a writ of mandamus with the Eleventh Circuit because Judge Moreno had not yet ruled on his motion for default judgment for Barclays' failure to respond to his complaint. The judge pointed out that the bank had filed a motion to dismiss, which tolled any other deadlines and was still pending.

In its motion to dismiss, Barclays says Mullane previously sued the bank in small claims court in Massachusetts over the same issue and lost. The decision has been appealed to the Massachusetts Supreme Judicial Court.

Mullane said he confirmed with a legal ethics professor at the University of Miami that there are no ethical issues with a pro se litigant asking a clerk procedural filing questions.

"The judge recused himself for the right reasons, and his recusal speaks for itself," Mullane said.

An attorney for Barclays did not respond to a request for comment.

Mullane is representing himself.

Barclays Bank Delaware is represented by Fentrice D. Driskell, Yolanda P. Strader, Scott D. Feather and Robert M. Quinn of Carlton Fields.

The case is Mullane v. Barclays Bank Delaware Inc., case number 1:18-cv-20596, in the U.S. District Court for the Southern District of Florida.

--Editing by Bruce Goldman.

Update: This story has been updated to add comments from Mullane.

End of Document

# EXHIBIT B

# *Rodriguez v. Copenhaver*

United States Court of Appeals for the Ninth Circuit

April 7, 2016, Argued and Submitted, Pasadena, California; May 25, 2016, Filed

No. 14-16399

**Reporter**

823 F.3d 1238 *; 2016 U.S. App. LEXIS 9559 **

DANIEL ANGEL RODRIGUEZ, Petitioner-Appellant, v. PAUL COPENHAVER, Respondent-Appellee.

**Prior History: [**1]** Appeal from the United States District Court for the Eastern District of California. D.C. No. 1:13-cv-01750-SMS. Sandra M. Snyder, Magistrate Judge, Presiding.

*Rodriguez v. Copenhaver, 2014 U.S. Dist. LEXIS 73845 (E.D. Cal., May 28, 2014)*

**Disposition:** REVERSED AND REMANDED.

## Case Summary

### Overview

HOLDINGS: [1]-The district court erred by dismissing the *28 U.S.C.S. § 2241* petition for lack of jurisdiction. The district court had jurisdiction to consider petitioner's claims that the BOP violated the U.S. Constitution, exceeded its statutory authority, or acted contrary to established federal law; [2]-The BOP acted contrary to *18 U.S.C.S. § 3621(b)(4)*, which directs the Bureau of Prisons, when designating a prisoner to a facility in which to serve his sentence, to consider "any statement by the court that imposed the sentence"; [3]-The BOP relied on a letter from a judge who not only was not the sentencing judge, but who had been formally recused from the case due to an actual conflict--namely, his connection to the victim of the crime. In relying on that letter, the BOP acted contrary to *§ 3621(b)(4)* and due process.

### Outcome

The court reversed and remanded for the district court to grant the petition for habeas corpus with directions to the BOP to promptly reconsider petitioner's request for a nunc pro tunc designation, without considering the letter from the recused judge.

## LexisNexis® Headnotes

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

### *HN1*[⬇] Imprisonment

*18 U.S.C.S. § 3621(b)(4)* directs the Bureau of Prisons, when designating a prisoner to a facility in which to serve his sentence, to consider "any statement by the court that imposed the sentence."

Criminal Law & Procedure > ... > Appeals > Standards of Review > De Novo Review

Criminal Law & Procedure > Habeas Corpus > Jurisdiction

### *HN2*[⬇] De Novo Review

The court of appeals reviews de novo both subject matter jurisdiction and the merits of a habeas claim.

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Criminal Law & Procedure > Habeas Corpus > Jurisdiction

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process

### *HN3*[⬇] Imprisonment

Although a district court has no jurisdiction over

discretionary designation decisions, it does have jurisdiction to decide whether the Bureau of Prisons acted contrary to established federal law, violated the U.S. Constitution, or exceeded its statutory authority when it acted pursuant to *18 U.S.C.S. § 3621*.

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN4*[⤓] **Imprisonment**

The Bureau of Prisons' authority to nunc pro tunc designate a state prison for service of a federal sentence derives from its authority to designate the facility where a federal defendant serves his sentence. *18 U.S.C.S. § 3621(b)*. *Section 3621(b)* gives the Bureau of Prisons discretion to designate the facility, but lists the factors that the Bureau of Prisons must consider when it exercises discretion. The statute directs the Bureau of Prisons to consider "any statement by the court that imposed the sentence--(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate." *18 U.S.C.S. § 3621(b)(4)*. This is a direction to the Bureau of Prisons to consider statements made by the sentencing judge to determine the judge's intent and reasoning for the particular sentence imposed on the particular defendant.

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Disqualification & Recusal

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN5*[⤓] **Disqualification & Recusal**

The *Due Process Clause of the Fourteenth Amendment* requires recusal of a judge who has a direct, personal, substantial pecuniary interest in reaching a conclusion against a defendant in his case. To perform its high function in the best way, justice must satisfy the appearance of justice. That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule.

**Summary:**

**SUMMARY**[*]

**Habeas Corpus**

The panel reversed the district court's dismissal of a federal prisoner's *28 U.S.C. § 2241* habeas corpus petition challenging the Bureau of Prisons' denial of a discretionary *nunc pro tunc* designation of a state prison for service of his sentence pursuant to *18 U.S.C. § 3621(b)*, and remanded.

The panel held that because the district court had jurisdiction to consider Rodriguez's claims that the BOP violated the Constitution, exceeded its statutory authority, or acted contrary to established federal law, the district court erred by dismissing the petition for lack of jurisdiction.

The panel held that the BOP acted contrary to *18 U.S.C. § 3621(b)(4)* and due process, when it relied on a letter from a judge who was not the sentencing judge, and who had been formally recused from the case due to an actual conflict — namely, his connection to the victim of the crime. The panel reversed and remanded for the district court **[**2]** to grant the habeas petition with directions to the BOP to promptly reconsider the prisoner's request for a *nunc pro tunc* designation, without considering the letter from the recused judge.

Judge Tashima concurred in part and dissented in part. He agreed that the BOP committed legal error under *§ 3621(b)(4)* in treating and relying on the letter of a judge who was not the sentencing judge, but he dissented from the majority's discussion of and "holding" that the BOP violated the prisoner's due process rights and statutory rights under the recusal statutes.

**Counsel:** Stephen R. Sady (argued), Chief Deputy Federal Public Defender, and Elizabeth G. Daily, Research & Writing Attorney, Portland, Oregon, for Petitioner-Appellant.

Audrey B. Hemesath (argued), Assistant United States Attorney, Camil A. Skipper, Appellate Chief, and Benjamin B. Wagner, United States Attorney, Sacramento, California, for Respondent-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**Judges:** Before: A. Wallace Tashima, Barry G. Silverman, and Susan P. Graber, Circuit Judges. Opinion by Judge Silverman. Partial Concurrence and Partial Dissent by Judge Tashima.

**Opinion by:** Barry G. Silverman

# Opinion

[*1239] SILVERMAN, Circuit Judge:

Federal prisoner Daniel Rodriguez appeals the district court's dismissal of his 28 U.S.C. § 2241 habeas [**3] petition challenging [*1240] the Bureau of Prisons' denial of a discretionary *nunc pro tunc* designation of a state prison for service of his federal sentence pursuant to 18 U.S.C. § 3621(b).

We hold that the district court erred by dismissing the petition for lack of jurisdiction. The district court had jurisdiction to consider Rodriguez's claims that the Bureau of Prisons violated the Constitution, exceeded its statutory authority, or acted contrary to established federal law. See Close v. Thomas, 653 F.3d 970, 973-74 (9th Cir. 2011).

We also hold that the Bureau of Prisons acted contrary to HN1[↑] 18 U.S.C. § 3621(b)(4), which directs the Bureau of Prisons, when designating a prisoner to a facility in which to serve his sentence, to consider "any statement by *the court that imposed the sentence*." (emphasis added). It is undisputed that the Bureau of Prisons relied on a letter from a judge who not only was *not* the sentencing judge, but who had been formally recused from the case due to an actual conflict — namely, his connection to the victim of the crime. In relying on that letter, the Bureau of Prisons acted contrary to 18 U.S.C. § 3621(b)(4) and due process. We reverse and remand for the district court to grant the petition for habeas corpus with directions to the Bureau of Prisons to promptly reconsider Rodriguez's [**4] request for a *nunc pro tunc* designation, without considering the letter from the recused judge.

I

Background

On July 24, 1994, Rodriguez was arrested on state charges in Miami, Florida. He was on parole for a previous state conviction at the time of his arrest. A month later, while Rodriguez was in state custody, he appeared in the United States District Court for the

Southern District of Florida, where he was charged with various firearm charges, and assault on a federal judge stemming from a home invasion robbery. Acting Chief District Judge Edward B. Davis previously had recused all of the district judges in the Southern District of Florida from Rodriguez's case because the alleged victim of the home robbery was a fellow judge of the district court in the Southern District of Florida.

Because all of the Southern District of Florida judges had been recused, the Chief Judge of the Eleventh Circuit appointed United States District Judge Robert Propst, from the Northern District of Alabama, to sit by designation and preside over Rodriguez's case in the Southern District of Florida. The jury acquitted Rodriguez of assault, but found him guilty of the firearm charges. Judge Propst then dismissed [**5] the firearm conviction related to the assault charge, leaving two convictions for felon in possession of a firearm.

On April 10, 1995, Judge Propst sentenced Rodriguez to a prison term of 272 months. At that time, Rodriguez was still in state custody while awaiting disposition of his state cases. The federal sentence was silent about whether it should run concurrently with or consecutively to the yet-to-be-imposed sentences for the new pending state charges and parole revocation. About three years after Rodriguez finished serving his state sentences, the Bureau of Prisons took custody of Rodriguez. That occurred on July 16, 1998.

Rodriguez requested that the Bureau of Prisons retroactively designate the Florida prison system for service of his federal sentence *nunc pro tunc* to September 1, 1994. In other words, he sought, in effect, to get credit toward his federal sentence for the time he spent in state custody before being transferred to the Bureau of Prisons on July 16, 1998. A *nunc pro tunc* designation would shorten Rodriguez's federal [*1241] sentence by approximately three years.[1]

Pursuant to the Bureau of Prisons' Program Statement and 18 U.S.C. § 3621(b)(4), Eric Wohltjen, Acting Chief of the Bureau's Designation and Sentence Computation Center, sent a letter to Judge Propst, but he mailed it to the Southern District of Florida, instead of to Alabama. The letter solicited Judge Propst's position on whether the retroactive designation should be granted. On March

---

[1] Rodriguez's federal sentence has been credited with some state time. The *nunc pro tunc* designation would, in [**6] effect, provide credit from September 1, 1994, to October 2, 1997.

18, 2010, Chief Judge Federico A. Moreno of the Southern District of Florida, not Judge Propst the sentencing judge, replied to the Bureau of Prisons as follows:

> Dear Mr. Wohltjen,
>
> I am in receipt of a copy of your letter to Judge Robert Propst, from the Northern District of Alabama, who presided over the above-styled case here in Miami. As a review of the file will reveal, a judge in our Court, Shelby Highsmith, was the victim in the case for which visiting Judge Propst sentenced Mr. Rodriguez to 272 months. Mr. Rodriguez was also sentenced in state court to a 20 year term for multiple counts of armed robbery and kidnapping.
>
> To now grant retroactive credit to Mr. Rodriguez for the time served in state custody would drastically reduce the sentence that visiting [**7] Judge Propst properly imposed. As the Chief Judge of the Southern District of Florida where Judge Highsmith honorably served until his recent retirement, I strongly oppose the defendant's request for the Bureau of Prisons to give him credit for the time he served in state prison on an unrelated violent crime. Unfortunately, Federal Judges have been the recipients of many threats in today's society. When a threat results in an actual attack, the offenders should be severely sanctioned. To now allow Mr. Rodriguez to be released on January 8, 2015 rather than October 19, 2018 is not only dangerous to the public but an insult to the victim in the federal case, Judge Shelby Highsmith, let alone the victims of the armed robbery in the state case. I hope that you deny his request for retroactive credit.

The Bureau of Prisons denied the *nunc pro tunc* designation request, writing to Rodriguez that

> we considered the nature of your instant offense conduct, the reasons for which you were in the custody of the State of Florida, the nature and repetitiveness of your criminal history, and your institutional adjustment. We also contacted the court regarding your request. In response, the court emphatically [**8] objected to your federal sentence commencing the day it was imposed as doing so would be a great insult to the victim of your federal crime which, a federal judge, and the victims of the armed robbery for which you were sentenced in state court. Accordingly, we determined a retroactive designation would be inconsistent with the goals of the criminal justice system.

Rodriguez then filed his *28 U.S.C. § 2241* habeas petition in the Eastern District of California, the district in which he was then incarcerated, alleging, first, that the Bureau of Prisons violated the law and Constitution by considering the recused judge's letter; and second, that Chief Judge Moreno, the recused judge, violated the recusal statute and recusal order by responding to the Bureau of Prisons in his official capacity. The district court dismissed the habeas petition, holding that it [*1242] lacked jurisdiction to review an individual discretionary denial of a *nunc pro tunc* designation by the Bureau of Prisons because *18 U.S.C. § 3625* specifically exempts *§ 3621* decisions from the judicial review provisions of the *Administrative Procedure Act*. Rodriguez appealed.

II

Jurisdiction and standards of review

We have jurisdiction pursuant to *28 U.S.C. § 1291*. *HN2*[⇑] We review de novo both [**9] subject matter jurisdiction and the merits of the habeas claim. *Close, 653 F.3d at 973*; *Reeb v. Thomas, 636 F.3d 1224, 1225 (9th Cir. 2011)*.

III

District court's jurisdiction

The district court erred when it dismissed the petition for lack of jurisdiction. *HN3*[⇑] Although a district court has no jurisdiction over discretionary designation decisions, it does have jurisdiction to decide whether the Bureau of Prisons acted contrary to established federal law, violated the Constitution, or exceeded its statutory authority when it acted pursuant to *18 U.S.C. § 3621*. *Close, 653 F.3d at 973-74*. Rodriguez alleged in the district court that the Bureau of Prisons's consideration of the recused judge's letter violated the law and Constitution. Therefore, the district court erred when it dismissed the petition for lack of jurisdiction. *Id.* Because the facts are undisputed, we address Rodriguez's wholly legal claim.

IV

Bureau of Prisons' consideration of the recused judge's letter

Rodriguez argues that the Bureau of Prisons acted contrary to *18 U.S.C. § 3621(b)(4)* when it considered an official letter from a judge who was both recused from Rodriguez's case and was not the sentencing

judge. We agree.

*HN4*[↑] The Bureau of Prisons' authority to *nunc pro tunc* designate a state prison for service of a federal sentence derives from its authority to designate [**10] the facility where a federal defendant serves his sentence. *18 U.S.C. § 3621(b)*; *Reynolds v. Thomas, 603 F.3d 1144, 1150 (9th Cir. 2010)*, *abrogated on other grounds by Setser v. United States, 566 U.S. 231, 132 S. Ct. 1463, 182 L. Ed. 2d 455 (2012)*. *Section 3621(b)* gives the Bureau of Prisons discretion to designate the facility, but lists the factors that the Bureau of Prisons must consider when it exercises discretion. The statute directs the Bureau of Prisons to consider "any statement *by the court that imposed the sentence—* (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate." *18 U.S.C. § 3621(b)(4)* (emphasis added). This is a direction to the Bureau of Prisons to consider statements made by the sentencing judge to determine the judge's intent and reasoning for the particular sentence imposed on the particular defendant. *See Rodriguez v. Smith, 541 F.3d 1180, 1189 (9th Cir. 2008)* (characterizing factors considered under *§ 3621(b)* to include the "sentencing judge's statement"); *Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 248 (3d Cir. 2005)* ("Congress expressed an intent that the [Bureau of Prisons] take into account the sentencing judge's recommendation."); *see also* Federal Bureau of Prisons Program Statement No. 5160.06, at 6 (Jan. 16, 2003) (setting forth procedures to follow "[w]hen the original sentencing judge is no longer available and the assigned judge offers no opinion"). [**11]

Thus, there is no doubt that the Bureau of Prisons doubly erred in considering [*1243] Chief Judge Moreno's letter: First, he was not the judge who imposed the sentence as *18 U.S.C. § 3621(b)(4)* contemplates; and second, he had been recused from the case and should not have participated in it in any way.

*HN5*[↑] The *Due Process Clause of the Fourteenth Amendment* requires recusal of a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [a defendant] in his case." *Tumey v. Ohio, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 5 Ohio Law Abs. 185, 25 Ohio L. Rep. 236 (1927)*. "[T]o perform its high function in the best way, *justice must satisfy the appearance of justice."* *Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865 n.12, 108 S. Ct. 2194, 100 L. Ed. 2d 855*

*(1988)* (emphasis added) (internal quotation marks omitted); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 617, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)* ("That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule." (quoting *Tumey, 273 U.S. at 522*)).

In this case, Chief Judge Moreno, a colleague of an alleged victim of Rodriguez's crimes, strongly recommended "severe[] sanction[s]" and the denial of the nunc pro tunc designation to avoid "insult" to his colleague. To make matters worse, the chief judge presented his recommendation under the guise of a neutral adjudicator by sending his letter in place of the sentencing judge's recommendation. The Bureau of Prisons adopted the recused judge's [**12] recommendation and denied Rodriguez's application. Such actions do not satisfy the appearance of justice. Nor do they afford Rodriguez his due process right to neutral adjudication. Thus, as a matter of both statute and due process, the Bureau of Prisons should not have considered Chief Judge Moreno's letter. *Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876, 883-84, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009)*; *Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971)*. Furthermore, there is no way that this error can be deemed harmless in as much as the Bureau specifically cited and relied on the Moreno letter in denying Rodriguez's application.

We reverse and remand for the district court to grant the writ and to direct the Bureau of Prisons to reconsider, within 30 days, Rodriguez's application for *nunc pro tunc* designation, and to do so without regard to Chief Judge Moreno's letter.[2]

**REVERSED AND REMANDED.**

**Concur by:** A. Wallace Tashima (In Part)

**Dissent by:** A. Wallace Tashima (In Part)

## Dissent

TASHIMA, Circuit Judge, concurring in part and

---

[2] Because we grant relief on this issue, we decline to consider the alternative arguments raised by Rodriguez. We also decline to consider the arguments waived in the district court.

dissenting in part:

In designating the place of a federal prisoner's confinement, the Bureau of Prisons ("BOP") is required to consider "any statement by the [**13] court that imposed the sentence[.]" *18 U.S.C. § 3621(b)(4)*. This requirement applies to retroactive, or *nunc pro tunc*, designations. Although one possible construction of the term "the court that imposed the sentence" is that it refers to the court as a whole, here the Southern District of Florida, I fully agree with the majority's interpretation that "[t]his is a direction to the Bureau of Prisons to consider statements made by the sentencing judge to determine the judge's intent and reasoning for the particular sentence imposed on the particular defendant." Maj. Op. at 10. Because Chief Judge Moreno was not the sentencing [*1244] judge, I agree that the BOP committed legal error under *§ 3621(b)(4)* in treating and relying on his letter as the views of the sentencing judge.[1]

This should end the matter and I would not further opine on whether the Chief Judge's letter was a violation of the recusal statutes or of due process, as does the majority. The recusal statutes apply only to in-court "proceedings." *See 28 U.S.C. § 144* (limiting application to "any proceeding in a district court"); *id. § 455(a)* (requiring judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). Indubitably, the BOP's designation of a prisoner's place of confinement is not a court "proceeding."[2] More importantly, the letter-writing judge is not the decision-making authority. Thus, at best, it is highly questionable whether the recusal statutes apply to *§ 3621* determinations by the BOP.

As for the asserted "due process" violation caused by the BOP's reliance on the Chief Judge's letter, the cases

the majority cites are inapposite. All of the cases cited by the majority, *see* Maj. Op. at 10-11, *Tumey v. Ohio, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 5 Ohio Law Abs. 185, 25 Ohio L. Rep. 236 (1927)*; *Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 865 n.12, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)*, *Concrete Pipe & Prods. Of Cal., Inc. v. Constr. Laborers Pension Tr. For S. Cal., 508 U.S. 602, 617, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)*; *Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009)*; and *Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971)*, concerned in-court proceedings and decisions [**15] made by judges in those proceedings, not a judge acting as a witness by sending a letter responding to the inquiry of an independent agency.

Moreover, it is entirely unnecessary to decide either the due process issue or the reach of the recusal statutes because the case can be completely disposed of on the statutory violation ground. Finally, because, as the majority holds, only the sentencing judge can respond to the BOP's *§ 3621* request, it is highly unlikely that a potential due process violation will arise again. Once the BOP's solicitation and consideration of *§ 3621* letters is limited to sentencing judges, by definition a judge who has been recused from the sentencing proceeding cannot be the sentencing judge. The problem should not recur. Thus, the majority's "decision" of these issues is not only dicta in the old fashioned sense, it is also unnecessary in the practical sense.[3]

I thus concur in all of the majority opinion, except for its discussion of and "holding" that the BOP violated Rodriguez's due process rights and statutory rights [*1245] under the recusal statutes, [**16] from which I respectfully dissent.

End of Document

---

[1] It is important to note that *§ 3621* is not an all encompassing statute. It does not prohibit the BOP from considering materials from other sources, nor does it exhaustively list what the BOP may not consider. For example, there is nothing in the statute that expressly prohibits the BOP from considering a letter from the victim, or from the inmate's parent or spouse. Because the issue is not before us, we need not decide whether the BOP was free to consider the Chief [**14] Judge's letter, as long as it made clear that it was not being considered as the views of the sentencing judge.

[2] In fact, in the usual case, the BOP's designation decision is not subject to judicial review under the APA. *See 18 U.S.C. § 3125*.

[3] I emphasize that the dicta is "unnecessary" because of our Circuit's unique — and unfortunate — view of dicta. *See Barapind v. Enomoto, 400 F.3d 744, 750-51 (9th Cir. 2005)* (en banc).

# EXHIBIT C

# Circuit Slams Advice From Judge With Conflict

IZZY KAPNICK   June 1, 2016

(CN) — The Ninth Circuit issued a stinging rebuke after advice from a judge with an irrefutable conflict of interest kept an inmate behind bars.

Saying "such actions do not satisfy the appearance of justice," the Ninth Circuit last week ordered the lower court to grant Daniel Angel Rodriguez habeas relief and potentially early release from prison.

Rodriguez has spent the last two decades behind bars for a home-invasion robbery where the victim was a federal judge with Florida's Southern District.

At trial in 1995, U.S. District Judge Shelby Highsmith testified that he was in his garage a year earlier when Rodriguez pistol-whipped him and stole his Rolex.

Rodriguez purportedly fled when Highsmith revealed his occupation. The judge said he managed to fire off two shots of his own as Rodriguez fled the scene.

Because of Highsmith's involvement in the case, every judge in Southern District had to recuse themselves from Rodriguez's federal trial.

U.S. District Judge Robert Propst came in from Birmingham, Alabama   , to oversee proceedings, which ended with a jury convicting Rodriguez for being a felon in possession of a firearm.

Though he received a federal prison sentence of 272 months, Rodriguez still awaited disposition of unrelated state charges.

He spent three years in a state prison before the U.S. Bureau of Prisons took custody of him in 1998.

Rodriguez requested credit for the three years of state imprisonment, leading the BOP to solicit a recommendation from the federal judge who sentenced him, Propst.

Rather than send the request to Propst in Alabama, however, BOP directed its request to the Southern District of Florida, where the trial occurred.

That court's chief judge, Federico Moreno, replied in 2010. Even though Moreno had recused himself from the 1995 trial based on conflict of interest, the Ninth Circuit said he adopted the "guise of a neutral adjudicator" in advising the BOP to reject Rodriguez's request.

"To now allow Mr. Rodriguez to be released on Jan. 18, 2015 rather than October 19, 2018 is not only dangerous to the public but an insult to the victim in the federal case, Judge Highsmith, let alone the victims of the armed robbery in the state case," Moreno had said.

Rodriguez was incarcerated in the Eastern District of California and filed suit there when the BOP turned down his request.

That court denied Rodriguez habeas relief, but a Pasadena-based panel of the Ninth Circuit reversed on May 25.

District courts lack jurisdiction over discretionary designation decisions, but they do "have jurisdiction to decide whether the Bureau of Prisons acted contrary to established federal law, violated the Constitution or exceeded its statutory authority," U.S. Circuit Judge Barry Silverman wrote for a three-judge court.

Finding that is what happened here, Silverman said "there is no doubt that the Bureau of Prisons doubly erred in considering Chief Judge Moreno's letter."

"First, he was not the judge who imposed the sentence as 18 U.S.C. § 3621(b)(4) contemplates; and second, he had been recused from the case and should not have participated in it in any way," the ruling continues.

Since the bureau "specifically cited and relied on the Moreno letter in denying Rodriguez's application," Silverman said there is "no way that this error can be deemed harmless."

In a partially dissenting opinion, U.S. Circuit Judge Wallace Tashima said his colleagues went too far in finding that "the chief judge's letter was a violation of the recusal statutes or of

## CNS Trends

 KFC Franchisee Loses Fight to Market Chicken as Muslim-Friendly

 Trump Tower Meeting Figure Stays Jailed on Child Porn Charges

 Suit Against Social Workers Over Bathtub Photos Revived

 Trans Woman Serves Up Lawsuit to Colorado Baker

 Ninth Circuit Takes New Look at Duty to Warn in Match Gone Bad

 Oregon Approves New Hunting Measure of Endangered Wolves

 Feds Sued to Stop Use of Bear Bait by Hunters in Idaho and Wyoming

 Scientists Discover How Tides Can Trigger Earthquakes

 US Lags Way Behind in Banning Harmful Pesticides

## Recent Posts

Largest Meteorite Strike in UK Discovered

Senators Hope to Force Vote on Arms Sales to Saudi Arabia

Massive Extradition Bill Protest Fills Hong Kong Streets

Case Opened: Democrats Begin Public Airing of Mueller Report

Victim of Fatal Police Shooting Honored in Oakland

Case 1:19-cv-11496-PBS    Document 1-3    Filed 07/09/19    Page 38 of 45

due process."

Before his death in December, Highsmith worked in the Southern District of Florida for 16 years, presiding over high-profile cases including civil claims stemming from the Elian Gonzalez custody controversy.

Rodriguez will be released if the prison bureau grants his request for the time-served credit upon reconsideration.

**Related**

**Ninth Circuit Orders New Look at Bond Hearings for Immigrants**
November 19, 2018
In "Appeals"

**9th Circuit Hears Cross-Border Shooting Case**
October 21, 2016
Similar post

**Court Paves Way for Trial in Texas Police Shooting**
November 28, 2018
In "Appeals"

# EXHIBIT D

6/11/2019     Ninth Circuit Directs BOP to Reconsider Denial of Designation to State Prison for Service of Federal Sentence | Prison Legal News

Case 1:19-cv-11496-PBS    Document 1-3    Filed 07/09/19    Page 40 of 45

You have 2 more free articles available this month. **Subscribe today (/subscribe/digital/)**.

# ✳ (/subscribe/digital/) Ninth Circuit Directs BOP to Reconsider Denial of Designation to State Prison for Service of Federal Sentence

Loaded on AUG. 2, 2016 by Derek Gilna (/news/author/derek-gilna/) published in Prison Legal News August, 2016 (/news/issue/27/8/), page 40

Filed under: DOC/BOP misconduct (/search/?selected_facets=tags:DOC/BOP%20misconduct), Judicial Misconduct (/search/? selected_facets=tags:Judicial%20Misconduct), Recusal (/search/?selected_facets=tags:Recusal). Location: United States of America (/search/?selected_facets=locations:998).

On May 25, 2016, the Ninth Circuit Court of Appeals reversed the dismissal of a federal prisoner's petition for habeas relief under 28 U.S.C. § 2241, in which he complained of an abuse of discretion by the federal Bureau of Prisons (BOP). The appellate court held the BOP had abused its discretion by considering a letter submitted by a recused, non-sentencing district court judge, Chief Judge Federico A. Moreno, who had a connection to the victim in the case and previously had been recused for that reason.

The Court of Appeals found the district court had the authority to consider claims raised by federal prisoner Daniel Angel Rodriguez – who argued the BOP violated 18 U.S.C. § 3621(b) when it denied his request for a discretionary nunc pro tunc designation of a state prison for service of his federal prison sentence – and the lower court had committed error by dismissing Rodriguez's § 2241 petition.

The Ninth Circuit also held that the BOP had erred when it "relied on a letter from a judge who not only was not the sentencing judge, but who had been formally recused ... due to an actual conflict." The letter, submitted by Judge Moreno, strongly objected to the relief requested by Rodriguez.

The BOP's decision, based in large part on Judge Moreno's letter, was significant because Rodriguez was still in state prison at the time of his federal conviction, and the "federal sentence was silent about whether it should run concurrently with or consecutively to the yet-to-be-imposed sentences for the new pending state charges and parole revocation."

Rodriguez faced federal charges – and was sentenced to 272 months in prison – for assaulting U.S. District Court Judge Shelby Highsmith during a home invasion robbery. Judge Moreno served in the same judicial district as Highsmith, who passed away due to unrelated causes in December 2015.

The appellate court found that a "nunc pro tunc designation [by the BOP] would shorten Rodriguez's federal sentence by approximately three years." The Court of Appeals made clear that the conditions for recusal are specific and meant to prevent any adverse inferences in a case where there was either

an apparent or actual conflict. Further, the Court stated, "there is no way that this error can be deemed harmless in as much as the [BOP] specifically cited and relied on the Moreno letter in denying Rodriguez's application."

"We reverse and remand for the district court to grant the writ and to direct the Bureau of Prisons to reconsider, within 30 days, Rodriguez's application for nunc pro tunc designation, and to do so without regard to Chief Judge Moreno's letter," the Ninth Circuit concluded. See: *Rodriguez v. Copenhaver*, 2016 U.S. App. LEXIS 9559 (9th Cir. 2016).

As a digital subscriber to Prison Legal News, you can access full text and downloads for this and other premium content.

Subscribe today (/subscribe/digital/)

Already a subscriber?   Login (/users/login/)

# Related legal case

## Rodriguez v. Copenhaver

| | |
|---|---|
| **Year** | 2016 |
| **Cite** | 2016 U.S. App. LEXIS 9559 (9th Cir. 2016) |
| **Level** | Court of Appeals |
| **Conclusion** | Bench Verdict |
| **Injunction Status** | N/A |

# EXHIBIT E



**Aaron Leibowitz** @aaron_leib · 20 Dec 2018

Here's a Boston case with Miami flare. In April, Miami federal judge Federico Moreno ripped into a law student representing himself in a credit score dispute. Moreno said the student had an improper meeting with his clerk. Law360 covered it. law360.com/articles/10339... (1/x)



law360.com

### Judge Recuses Self, Scolds Law Student-Plaintiff -...

U.S. District Judge Federico Moreno recused himself Monday from a law student's suit against Barclays Bank Delaware over a credit card dispute, but not before h...

♡ 1      ⇄ 1      ♡ 3      ◻



**Aaron Leibowitz** @aaron_leib · 20 Dec 2018

Judge Moreno called up the U.S. Attorney's office in Miami, where the student was an intern. In court, he blasted the student: "You'll never be able to work at the U.S. Attorney's again." Said he "may never be a lawyer." (2/x)

♡ 1      ⇄      ♡      ◻



**Aaron Leibowitz** @aaron_leib · 20 Dec 2018

Essentially, the law student had gone to Moreno's clerk's office (wearing a t-shirt, shorts and flip-flops) to ask for a copy of his case file. He wanted to petition the 11th Circuit appeals court to tell Moreno to speed up work on the case. Hence, Moreno wasn't pleased. (3/x)

♡ 1      ⇄      ♡      ◻

# EXHIBIT F

Robert Polsky

Your Correspondence re: Law360 Article

add to Contacts...

Jonathan Mullane

Siri found new contact info in this email: Robert Polsky; robert.polsky@law360.com

Mullane

The article is true in all material respects and, as indicated previously, we are not prepared to change it. If is not clear that the supposed factual inaccuracy you allege - even if you are correct - has any impact on your professional or personal reputation. Putting aside the defense of truth against defamation claims).

what it's worth, our offer to apply robot exclusions seems perfectly reasonable and I would urge you again to consider it and consider this matter closed.

The unfortunate event that you decide to pursue your threat of voice on its face appears pretty clearly to be frivolous litigation, please be advised that, as a journalistic organization, we will not hesitate to vigorously defend our First Amendment rights and avail ourselves of any remedies - include applicable anti-SLAPP statutes - that may be available to us.

Please be guided accordingly.

Regards,

Robert Polsky, General Counsel
Portfolio Media, Inc.

LAW360

A LexisNexis® Company

Legal News and Data

111 West 19th Street, 5th floor
New York, NY 10011
T +1 646.783.7182
M +1 646.401.2068
F +1 646.783.7161

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is prohibited. If you are not the intended recipient, please contact the sender and delete all copies. Thank you.

The foregoing is not a comprehensive account of the relevant facts in this matter and all rights are reserved.